# WHARTON *v.* WISE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

No. 1054. Argued March 5, 6, 1894. — Decided April 23, 1894.

The compact of March 28, 1785, between the States of Virginia and Maryland, having been duly ratified by each State, is binding upon both as to the subjects embraced within it, so far as it is not inconsistent with the Constitution of the United States.

That compact was not prohibited by Article 6 of the articles of Confederation, forbidding any treaty, confederation or alliance between two or more States without the consent of Congress; and it continued in force after the adoption of the Constitution, except so far as inconsistent with its provisions, and received the assent of Congress by the adoption or approval of proceedings taken under it.

The compact of 1785 contained no reference to fish of any kind in Pocomoke River or Pocomoke Sound, and no clause in that compact gave Maryland a right to fish in that river or sound.

*Hendricks* v. *Commonwealth,* 75 Virginia, 934, criticised and questioned.

The 10th section of the compact of 1785 does not forbid the State of Virginia from trying and convicting citizens of Maryland for offences committed in Virginia against its laws regulating the oyster fisheries.

THIS case came before the court on appeal from an order of the Circuit Court of the United States for the Eastern District of Virginia, dismissing a writ of *habeas corpus*, sued out for the discharge of the appellant, a citizen of Maryland, from a judgment of imprisonment until a fine should be paid, imposed upon him by the county court of Accomack County in that State, upon a conviction of violating a law of Virginia in taking oysters, contrary to its prohibitions, from Pocomoke Sound, within her limits. An act of that Commonwealth, approved in February, 1892, provides that if any person, other than a resident of the State, "take or catch oysters or other shellfish in any of the waters of the State, he shall, upon conviction thereof, be fined five hundred dollars." Acts of the Legislature of Virginia, 1891–2, c. 363, amending § 2153 of the Code of Virginia, paragraph 10, p. 603.

At March term, 1893, of the county court of Accomack County, the appellant was indicted by the grand jury of the county for that, being a non-resident of Virginia, he did unlawfully take and catch oysters in the waters of the State and within the jurisdiction of the county, to wit, on Ledge Rock in Pocomoke Sound, against the peace and dignity of the Commonwealth. At the following April term he appeared in court and filed a special plea to its jurisdiction, alleging that at the time the offence charged was committed he was a citizen of Maryland, residing in Somerset County of that State, and that the act of the assembly of Virginia, under which the indictment was found, had not been adopted or ratified by the general assembly of Maryland ; that, by the compact of 1785, between those States, which had never been repealed, or annulled, but was still in effect, and operative, the court had no jurisdiction to try the defendant for the alleged offence, Pocomoke Sound mentioned in the indictment being a part of Pocomoke River mentioned in the compact. The Commonwealth demurred to the plea, and the court sustained the demurrer, adjudging the plea to be insufficient. Thereupon

the defendant, under the plea of not guilty, was tried and convicted, and was sentenced to pay a fine of five hundred dollars, the sum prescribed by the statute for the offence, and the costs of the prosecution, and ordered to be committed to the jail of the county until the fine and costs were paid. Averring that he intended to apply to the Circuit Court for a writ of error, he moved the county court to be admitted to bail pending his appeal, but the motion was denied, on the ground that the law of the State did not provide for admitting a person to bail after conviction. He was thereupon taken to the jail by the sheriff of the county and detained by him in default of payment of the fine and costs. He then applied to the Circuit Court of the United States for the Eastern District of Virginia for a writ of *habeas corpus* to be directed to John H. Wise, the sheriff of the county of Accomack, by whom, under the judgment, he was imprisoned, requiring the officer to produce the petitioner before that court, with the authority for his detention, alleging that his imprisonment was unlawful on grounds, which, as stated by counsel, were similar to those now urged for a reversal of the judgment before us, namely : That the compact of 1785, between the States of Virginia and Maryland, was still a subsisting agreement, binding upon and enforceable by each of those States and the citizens thereof; that by its provisions the citizens of Maryland possess and are entitled to enjoy freely a right of fishery, including the right to take oysters in common with the citizens of Virginia, in the Pocomoke River; that that river, as mentioned in the compact of 1785, embraces what is now commonly called Pocomoke Sound, which is nothing but the mouth of Pocomoke River; that the law of Virginia, under which the petitioner was arrested, indicted, and convicted, was never adopted by the concurrent legislation of Maryland, and was therefore inoperative as against the citizens of that State, and that the conviction thereunder of the petitioner, who was a citizen of Maryland, was void. And on the further ground that, assuming the law of Virginia was not inoperative against citizens of Maryland, still, under the tenth section of the compact of 1785, the petitioner, as a citizen of that State, could not be lawfully tried in the

.courts of Virginia for the offence charged, but was to be tried in the courts of Maryland.

The writ was issued, directed to the sheriff of Accomack County, and made returnable before the Circuit Court of the United States for the Eastern District of Virginia at Norfolk on the 11th of May, 1893, and was then adjourned for hearing in Richmond on the 1st of June following, at which time and place the case was fully heard. At the succeeding term the court rendered its decision to the effect that the writ of *habeas corpus* be dismissed, and that the petitioner be remanded to the custody of the sheriff of Accomack County. From this judgment the petitioner appealed to this court.[1]

*Mr. John Prentiss Poe*, Attorney General of Maryland, *Mr. Bradley T. Johnson*, and *Mr. Thomas S. Hodson* for appellant.

The compact of 1785, between Virginia and Maryland, is still a subsisting agreement, binding upon and enforceable by each of these States, and the citizens thereof, according to its true interpretation, except in so far as some of its provisions have been superseded by the Constitution of the United States. By the true interpretation of those parts of such compact as are still in force, the citizens of Maryland now possess and are entitled to enjoy freely a right of fishery, including the right to take oysters, in common with the citizens of Virginia, in the Pocomoke River.

This compact was arranged immediately after the Revolution, and was a commercial necessity, at that time, to both States, in their new and changed condition.

The Mount Vernon Commissioners understood the necessity for uniformity in the regulations and in the punishment for

---

[1] The provisions of the compact of 1785 involved in this case, will be found in the opinion of the court, *infra;* and also references to the legislation of Maryland and Virginia and of Congress touching it. The Pocomoke River and the Potomac River, the two subjects of the compact, enter the Chesapeake Bay about opposite each other — the Pocomoke coming down to the eastern shore from the north and east, the Potomac to the western shore from the north and west.

infractions of them. They therefore provided for it in the 8th section of the compact, which provides that "all laws for the preservation of fish or for the performance of quarantine, in the river Potomac, or for preserving or keeping open the channel and navigation thereof, or of the river Pocomoke, within the limits of Virginia, by preventing the throwing out of ballast or of giving any other obstruction thereto, shall be made with the mutual consent and approbation of both States."

The letter of this section can be construed in two ways. One construction excludes the Pocomoke River wholly from that portion of the 8th section which refers to "laws for the preservation of fish." This is the construction now put upon it by the law officers of Virginia in this suit. This view is of recent origin and was unknown in the earlier history of the States under the Constitution of the United States.

The second view of the proper construction of the letter of the 8th section is that there is a *complete* mutuality as to both rivers, and the rights to be enjoyed in them by the people of the two States. Both these are grammatical constructions, and the latter has the greater weight both in years and in authority, and makes the letter and the spirit of the compact to agree.

The legislature of Virginia by an unbroken series of acts, beginning with its first oyster law and extending down to 1880, has practically put upon the 8th section the latter interpretation, and has conceded to Marylanders in both rivers the same oyster rights as Virginians. The laws will be referred to, particularly, hereafter.

The Court of Appeals of Virginia in *Hendricks* v. *Commonwealth*, 75 Virginia, 934, 941, in discussing an indictment founded, expressly and confessedly, upon the 8th section, says: "The effect of this section (the 8th of the compact) is to give to the State of Virginia, concurrent jurisdiction with the State of Maryland over the Potomac River from shore to shore, and over that part of Pocomoke River which is within the limits of Virginia, to enact such laws, with the consent and approval of Maryland, as may be deemed necessary and proper for the preservation of fish in said waters."

If the 8th section is to be interpreted according to its *spirit* and not its mere letter, there is but one construction possible to be placed upon it. Maryland was giving up certain rights " in the river Potomac" within the limits of Maryland, and receiving in return, " mutual" and similar concessions in " the river Pocomoke within the limits of Virginia."

It seems to be now universally conceded that the term " fish " includes oysters. Gould's Laws of Waters, § 20, and note.

Marylanders, from time immemorial, enjoyed the right of oystering in Pocomoke Sound, without molestation, until shortly before the line was determined by the arbitrators in 1877, and located by commissioners appointed by the two States in 1883.

Interpreted then either by the letter or by the spirit of the compact, there is an entire mutuality or equality of privileges in both rivers, for both States. And all the departments of the government of Virginia have acted in conformity with this view since the making of the compact in 1785.

It has been suggested that the Acts of Assembly supposed to sustain the above construction of the compact were not concessions of the Maryland right, but only a temporary suspension of the exclusive right of Virginia pending the controversy as to the line.

This cannot be true. There never has been any real controversy between the two States as to the line, on land, on the eastern shore of Maryland and Virginia. Nobody ever cared about this land and no controversy could have been aroused with reference to that. There was unfortunately a controversy as to the territory between the north and south branches of the Potomac, in what is now West Virginia. But for this, no controversy, on the eastern shore, would have ever been heard of.

The compact and the legislative action of Virginia, and the peaceable enjoyment of their equal rights to fish in Pocomoke by citizens of Maryland, was for more than half a century a complete and satisfactory settlement of the whole controversy on the lower Potomac and in Pocomoke Sound. The disputed

location of the line, as to the upper branches of the Potomac, alone, kept the controversy open.

[Counsel then contended at some length, in an historical argument, that Pocomoke Sound is a part of Pocomoke River, and was so understood to be by the negotiators of the compact of 1785 ; but in view of the action of this court, this contention is unimportant.]

Inasmuch as the statute of Virginia under which the appellant was arrested, indicted, and convicted was never adopted and enacted by concurrent legislation of Maryland, as stipulated in the compact, it was and is inoperative by virtue of that compact, as against citizens of Maryland, and that, therefore, the conviction thereunder of the appellant, who was and is a *bona fide* citizen of Maryland, was illegal and void.

Assuming, but not conceding, that the citizens of Maryland do not possess and are not entitled to a free right of fishery, including the right to take oysters, in common with the citizens of Virginia, in Pocomoke River, and assuming further that Pocomoke River, as mentioned in the compact, does not embrace Pocomoke Sound, and assuming further that the statute of Virginia in question did not require the concurrence of Maryland in order to render it operative as against citizens of Maryland, still under the tenth section of the compact, the appellant as a citizen of Maryland could not lawfully be tried in the courts of Virginia for an alleged violation of that statute, but was entitled to be tried in the courts of Maryland ; and consequently his trial and conviction in Accomack County Court was illegal and void.

Being thus unlawfully deprived of his liberty, contrary to the Constitution and laws of the United States, by the void judgment of a court which had no jurisdiction to try him, and being unable in any other mode to obtain a proper hearing of his case, and a release from such unlawful judgment and imprisonment, the court below, upon petition of the appellant for the writ of *habeas corpus*, had ample jurisdiction to order his discharge, and should have done so upon the case made. Consequently the order of the court below, dismissing the writ and remanding the appellant to the custody

of the sheriff of Accomack County, was erroneous and should be reversed.

*Mr. R. Taylor Scott*, Attorney General of the State of Virginia, *Mr. James H. Fletcher, Jr., Mr. William A. Jones*, and *Mr. Waller R. Staples* for appellee.

Mr. Justice Field, in delivering the opinion of the court, stated the case as above reported, and continued:

The disposition of the appeal will require an examination of certain provisions of the compact between the States of Maryland and Virginia of 1785, as upon their interpretation and effect the controversy which has given rise to the present proceeding, and similar controversies between citizens of those States, and their respective rights to fish in the waters of Virginia for oysters, will be determined. The questions involved are of deep interest to both States, and they have been presented by distinguished counsel on their behalf with great ability.

Previously to June, 1784, great inconveniences were experienced by citizens of both Maryland and Virginia from the want of established and recognized regulations between those States respecting the jurisdiction and navigation of the river Potomac, which constituted a boundary between the two States for over one hundred miles. In that month and year the general assembly of Virginia, reciting that such inconveniences resulted from want of some concerted regulations between the States, " touching the jurisdiction and navigation of the river Potomac," passed the following resolutions:

" *Resolved*, That George Mason, Edmund Randolph, James Madison, Jr., and Alexander Henderson, Esquires, be appointed commissioners, and that they, or any three of them, do meet such commissioners as may be appointed on the part of Maryland, and in concert with them frame such liberal and equitable regulations concerning the said river as may be mutually advantageous to the two States, and that they make report thereof to the general assembly.

"*Resolved,* That the executive be requested to notify the above appointment, with the object of it, to the State of Maryland, and desire its concurrence in the proposition."

The resolutions were communicated to the Executive of Maryland, and by him laid before the legislature of that State, which responded to the invitation by a resolution, passed on the 18th of January, 1785, appointing commissioners on her part to meet those of Virginia, but with powers somewhat enlarged. The resolution, as adopted by the Senate of Maryland, declared that Thomas Johnson, Thomas Stone, Samuel Chase, and Daniel of St. Thomas Jenifer (selected by the House of Representatives two days before) should be commissioners for the State of Maryland to meet the commissioners appointed by the Commonwealth of Virginia, " for the purpose of settling the *navigation* and *jurisdiction* over that part of the bay of Chesapeake which lies within the limits of Virginia, and over the rivers Potomac and Pocomoke ; " and that the commissioners, or any two of them, should have full power, on behalf of Maryland, " to adjudge and settle the jurisdiction to be exercised by the said States, respectively, over the waters and navigation of the same, the proceedings to be laid before the general assembly of the State to be ratified," etc.

The commissioners met at Mt. Vernon in the following year, and on the 28th of March a compact between the two States was mutually agreed upon by them.

In its first clause Virginia disclaimed all right to impose any toll, duty or charge, prohibition or restraint on any vessel sailing through the capes of Chesapeake Bay to the State of Maryland, or from that State through the capes outward bound, and agreed that the waters of Chesapeake Bay and Pocomoke River within the limits of Virginia should be forever considered as a common highway for the use and navigation of any vessels belonging to the State of Maryland or any of its citizens, or for carrying on any commerce to or from that State or with any of its citizens, and that any such vessel inward or outward bound might enter any of the rivers within the Commonwealth of Virginia as a harbor or for safety against an enemy, without the payment of port duties or any other

charge; and that the waters of Chesapeake Bay and Poco-
moke River should be free for the navigation of vessels from
one part of the State of Maryland to another.

In the second clause the State of Maryland agreed that any
vessel belonging to Virginia or any of its citizens, or carrying
on commerce to or from that State, or with any of its citizens,
might freely enter its rivers as a harbor, or for safety against an
enemy, without the payment of any port duty or other charge.

In the third clause it was provided that war vessels, the
property of either State, should not be subject to the payment
of any port duty or other charge.

The fourth and fifth clauses related to commerce between
citizens of the two States in their produce, providing that
vessels of a certain size might enter and trade in the ports of
either State with a permit from the naval officer of the dis-
trict, and should not be subject to port charges.

The sixth clause declared that the river Potomac should be
considered a common highway for the purpose of navigation
and commerce to the citizens of both States, and all other
persons in amity with the two States, trading to or from
Virginia or Maryland.

The seventh clause provided that "the citizens of each State,
respectively, shall have full property in the shores of Potow-
mack River adjoining their lands, with all emoluments and
advantages thereunto belonging, and the privilege of making
and carrying out wharves and other improvements, so as not
to obstruct or injure the navigation of the river; but the right
of fishing in the river shall be common to and equally enjoyed
by the citizens of both States; provided, that such common
right be not exercised by the citizens of the one State to the
hindrance or disturbance of the fisheries on the shores of the
other State; and that the citizens of neither State shall have a
right to fish with nets or seines on the shores of the other."

The eighth clause provided that "all laws and regulations
which may be necessary for the preservation of fish, or for
the performance of quarantine in the river Potowmack, or for
preserving and keeping open the channel and navigation
thereof, or of the river Pocomoke, within the limits of

Virginia, by preventing the throwing out ballast or giving any other obstruction thereto, shall be made with the mutual consent and approbation of both States."

The tenth clause provided that "all piracies, crimes, or offences committed in that part of Chesapeake Bay which lies within the limits of Virginia, or that part of the said bay where the line of division from the south point of Potowmack River, (now called Smith's Point,) to Watkins' Point, near the mouth of Pocomoke River, may be doubtful and on that part of Pocomoke River within the limits of Virginia, or where the line of division between the two States upon the said river, is doubtful, by any persons not citizens of the Commonwealth of Virginia against the citizens of Maryland, shall be tried in the court of the State of Maryland which hath legal cognizance of such offence. And all piracies, crimes, or offences committed on the before-mentioned parts of Chesapeake Bay and Pocomoke River, by any persons, not citizens of Maryland, against any citizen of Virginia shall be tried in the court of the Commonwealth of Virginia which hath legal cognizance of such offence. All piracies, crimes, and offences committed on the said parts of Chesapeake Bay and Pocomoke River, by persons not citizens of either State, shall be tried in the court of the Commonwealth of Virginia having legal cognizance of such offences. And all piracies, crimes, and offences committed on the said parts of Chesapeake Bay and Pocomoke River, by any citizen of the Commonwealth of Virginia or of the State of Maryland, either against the other, shall be tried in the court of that State of which the offender is a citizen."

There were other provisions in the compact, but those to which reference is made are all that are important in the disposition of the present case.

The compact provided that its articles should be laid before the legislatures of the two States and, their approbation being obtained, should be confirmed and ratified by a law of each State, never to be repealed or altered by either without the consent of the other. The articles were accordingly laid before the legislatures of those States and were approved,

ratified, and confirmed by a law of each substantially identical in terms. The concluding clause of the act of ratification of the legislature of Virginia is as follows: " And whereas this general assembly are of opinion that the said compact is made on just and mutual principles for the true interests of both governments, and the same having been confirmed by the general assembly of the State of Maryland, be it therefore enacted that the said compact is hereby approved, confirmed, and ratified by the general assembly of Virginia, and that every article, clause, matter, and thing therein contained shall be obligatory on this State and the citizens thereof, and shall be forever faithfully and inviolably observed and kept by this government and all its citizens according to the true intent and meaning of this compact; and the faith and honor of this State are hereby solemnly pledged and engaged to the State of Maryland and the government and citizens thereof that this law shall never be repealed or altered by the legislature of this commonwealth without the consent of the State of Maryland."

A similar clause concludes the act of ratification by the State of Maryland, with a change only in the terms required to indicate it as the act of Maryland instead of that of Virginia.

The provisions of the compact were well designed to promote the peace, good neighborhood, and welfare of both States, and facilitate intercourse between their citizens, and it was clearly within their competency at the time to adopt them, if not restrained by the Articles of the Confederation, then in existence and in which they had joined. They were then sovereign States, possessing, unless thus restrained, all the rights and powers of independent nations over the territory within their respective limits, and could exercise any control and dominion over their navigable waters and make any regulations necessary for the protection of their navigation or to promote the commerce upon them of their respective States. Those articles expressly provided that each State composing the Confederation retained its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which was

not by them expressly delegated to the United States in Congress assembled. The Confederation was a league of friendship of the States with each other, so declared in the articles and entered into " for their common defence, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretence whatever." But its articles did not form a constitution or ordinance of government, with power to enforce its provisions upon each other, or even a compact having any coherence or binding force other than that of a league of friendship, which its members only claimed them to constitute.

The validity of the compact of 1785 has been questioned as in conflict with the second clause of the sixth article of the Confederation, which provided that no two or more States should enter into any treaty, confederation, or alliance whatever between them without the consent of the United States in Congress assembled, specifying accurately the purposes for which the same was to be entered into, and how long it should continue; and also as having been superseded by the Constitution of the United States subsequently adopted. A few words upon each of these positions. The articles inhibiting any treaty, confederation, or alliance between the States without the consent of Congress were intended to prevent any union of two or more States, having a tendency to break up or weaken the league between the whole; they were not designed to prevent arrangements between adjoining States to facilitate the free intercourse of their citizens, or remove barriers to their peace and prosperity ; and whatever their effect, such arrangements could not be the subject of complaint by the States making them until, at least, the Congress of the Confederation interposed objections to their adoption or enforcement, which was never done.

The provisions of the compact, so far as they were inconsistent with the Constitution of the United States, subsequently adopted, and to which Maryland and Virginia were parties, were of course suspended and superseded by it.

But as an operative agreement, binding the action of the two States upon the subjects embraced, where not inconsistent with the Constitution, its validity has often been recognized by their authorities. Neither of the governments has ever denied or repudiated its obligation, but, as in the present case and in all controversies between the States, it has been treated as of obligatory force.

In determining the effect of the prohibition of the clause in the sixth article of the confederation upon the validity of the compact, the observations of this court, in the recent decision of the controversy between Virginia and Tennessee, upon the meaning of the clause of the Constitution of the United States which is similar, in one particular, with that in the Articles of Confederation, and broader in another, may be properly considered. The article of the confederation inhibits "any treaty, confederation, or alliance" between two or more States without the consent of Congress. The Constitution of the United States prohibits, without such consent, any agreement or compact of one State with another. In the case mentioned there was an agreement between the States of Virginia and Tennessee to appoint commissioners to run and mark the boundary between them, made without the consent of Congress, and the question considered was whether the agreement was within the prohibition of the clause cited from the Constitution of the United States, and we said: "The terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects; to those to which the United States can have no possible objection or have any interest in interfering with, as well as to those which may tend to increase and build up the political influence of the contracting States, so as to encroach upon or impair the supremacy of the United States or interfere with their rightful management of particular subjects placed under their entire control.

"There are many matters upon which different States may agree that can in no respect concern the United States. If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter

State might desire to acquire as a site for a public building, it would hardly be deemed essential for the latter State to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land. If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal, it would hardly be deemed essential for that State to obtain the consent of Congress before it could contract with New York for the transportation of the exhibits through that State in that way. If the bordering line of two States should cross some malarious and disease-producing district, there could be no possible reason, on any conceivable public ground, to obtain the consent of Congress for the bordering States to agree to unite in draining the district, and thus removing the cause of disease. So in case of the threatened invasion of cholera, plague, or other causes of sickness and death, it would be the height of absurdity to hold that the threatened States could not unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of Congress, which might not be at the time in session. If, then, the terms 'compact' or 'agreement' in the Constitution do not apply to every possible compact or agreement between one State and another, for the validity of which the consent of Congress must be obtained, to what compacts or agreements does the Constitution apply?

" We can only reply by looking at the object of the constitutional provision, and construing the terms 'agreement' and 'compact' by reference to it. It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context. *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.

" Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is

directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States. Story, in his Commentaries, (§ 1403,) referring to a previous part of the same section of the Constitution in which the clause in question appears, observes that its language '.may be more plausibly interpreted from the terms used, "treaty, alliance, or confederation," and upon the ground that the sense . of each is best known by its association (*noscitur a sociis*) to apply to treaties of a political character; such as treaties of alliances for purpose of peace and war; and treaties of confederation, in which the parties are leagued for mutual government, political coöperation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges;' and that the 'latter clause, "compacts and agreements," might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty; such as questions of boundary; interests in land situate in the territory of each other; and other internal regulations for the mutual comfort and convenience of States bordering on each other.' And he adds: 'In such cases the consent of Congress may be properly required, in order to check any infringement of the rights of the national government; and, at the same time, a total prohibition to enter into any compact or agreement might be attended with permanent inconvenience or public mischief.' " *Virginia* v. *Tennessee*, 148 U. S. 503, 518, 519, 520.

So, in the present case, looking at the object evidently intended by the prohibition of the Articles of Confederation, we are clear they were not directed against agreements of the character expressed by the compact under consideration. Its execution could in no respect encroach upon or weaken the general authority of Congress under those articles. Various compacts were entered into between Pennsylvania and New Jersey and between Pennsylvania and Virginia, during the Confederation, in reference to boundaries between them, and to rights of fishery in their waters, and to titles to land in

their respective States, without the consent of Congress, which indicated that such consent was not deemed essential to their validity. Virginia and Maryland were sovereign States with no common superior and no tribunal to determine for them the true construction and meaning of its provisions in case of a conflict of opinion upon the subject. Each State was left to decide for itself as to their true construction and meaning, and to its own sense of the obligations of the compact for their enforcement. If, therefore, the Congress of the United States, which, as said above, never complained of the compact of 1785, had interposed objections to its adoption or enforcement as being within the meaning of the terms treaty or confederation, or as establishing an alliance within the prohibition of the articles mentioned, yet it would not lie in either of the States that were parties to the contract to allege its invalidity on the subject. As said by Mr. Steele, in his very able and elaborate opinion, upon the construction of provisions of the compact, given to the governor of Maryland, and which is referred to in the record, they cannot complain that there was in its adoption any breach of good faith towards themselves, and we may add, or any rupture by them of the league of friendship declared to be the object of the articles to establish.

In our judgment the compact of 1785 was not prohibited by the Articles of Confederation. It was not a treaty, confederation, or alliance within the meaning of those terms as there used, and it remained as a subsisting operative contract between them, in full force when the confederation went out of existence upon the adoption of the present Constitution of the United States. And it was not affected or set aside by the prohibitory clause of that instrument. Its prohibition extends only to future agreements or compacts, not against those already in existence, except so far as their stipulations might affect subjects placed under the control of Congress, such as commerce and the navigation of public waters, which is included under the power to regulate commerce.

As stated by counsel, stipulations as to riparian rights of fishery, and as to jurisdiction in and over waters lying between

the two States, remained as they previously existed, neither suspended or impaired.

We are therefore of opinion that the compact continued in full force after the adoption of the Constitution, except so far as inconsistent with its provisions; and such we understand has been the clear declaration of the two States whenever they have been called upon to express their opinion upon the subject, and such is the concession of counsel. In the acts of both States, passed in 1874, designating arbitrators to ascertain and fix the boundary between them, the validity of the compact was affirmed in the declaration that "neither of the said States, nor the citizens thereof, shall, by the decision of the said arbitrators, be deprived of any of the rights and privileges enumerated and set forth in the compact between them, entered into in the year 1785, but that the same shall remain to and be enjoyed by the said States and the citizens thereof forever." Act of March 28, 1874, c. 135, Laws of Virginia, 1874, 151; Act of April 11, 1874, c. 274, Laws of Maryland, 1874, 365.

As justly observed, there could not be a more solemn and conclusive recognition and assertion — so far as the two States were concerned — of the continued existence and obligatory force of the compact than is contained in this language of both in appointing the arbitrators and designating the conditions upon which their award should be accepted. The States of Maryland and Virginia not only consented to the appointment of the arbitrators, upon the conditions mentioned, but their award was approved by both States and by an act of Congress. That approval covered all the conditions and stipulations upon which the award was made, and renders the compact of 1785, the rights and privileges of which were to remain and be enjoyed by the States and the citizens thereof forever, thus consented to by Congress, free from constitutional objections, if any, that were valid, had previously existed. The act of Congress of March 3, 1879, c. 196, 20 Stat. 481, 483, recited that arbitrators, duly appointed on the part of the States of Virginia and Maryland for the purpose of ascertaining and fixing the boundary between them, did proceed to examine into and ascertain the true line of said boundary, and

had made their award, which was set forth, and that that award had been ratified and confirmed by the legislatures of those States, respectively, and then enacted that the consent of Congress was given to the agreement or award and to each and every part and article thereof. That consent, taken in connection with the conditions upon which the award was authorized, operated as an approval of the original compact, and of its continuance in force under the sanction of Congress. The consent of Congress to any agreement or compact between two or more States is sufficiently indicated, when not necessary to be made in advance, by the adoption or approval of proceedings taken under it. *Green* v. *Biddle,* 8 Wheat. 1, 85, 86, 87.

We proceed, therefore, to consider the clauses of the compact, upon the construction of which the present controversy must be determined.

The appellant, a citizen of Maryland, is under a judgment of imprisonment for not paying a fine and costs of prosecution imposed for unlawfully catching and taking oysters in the waters of Virginia in violation of its laws. That State is the owner of the navigable waters within its limits and the lands under them, holding them in trust for the public, and authorized to pass all necessary laws for the protection of the fish therein, whether floating or shell, and the punishment of any citizens of its own or other States for taking them against its prohibitions.

The oyster grounds of the State are of large extent, very productive, and of great value. Pocomoke Sound is represented to have an area of 92 square miles, of which about 52 square miles consist of natural oyster rocks and beds, particularly adapted for the growth of the oyster. Many millions of oysters, are the product from these rocks and beds each year. The business of taking them from the water and carrying them to the different markets of the country constitutes an extensive and profitable industry, giving occupation and support to several thousand people of the State and to their families, and furnishing an article of food extremely palatable and delicious to many thousands in other States. Great care

is taken in their culture and protection, and a vigorous police of the State is maintained to prevent their unlawful removal, or any encroachment with respect to them upon the rights of the State. The preservation of the oysters and of these rocks and beds, so well and peculiarly fitted for their increase, has been for many years a matter of special interest on the part of the State, and the act under which the appellant was indicted and convicted constitutes a part of its legislation for that purpose.

The contention of Maryland, as made by her counsel on behalf of the appellant, is that by the true construction of the seventh and eighth sections of the compact of 1785, her citizens are lawfully entitled to possess and enjoy and exercise a common right of fishery, including the right to catch and take oysters in the Potomac River and in the Pocomoke River, including what is also called Pocomoke Sound, which is alleged to be part of that river, and to constitute its mouth; and further, that if her citizens do not possess such right of fishery in the Pocomoke River and Pocomoke Sound, they cannot be subjected to trial in the courts of Virginia for the offences charged to have been committed in those waters against the citizens of that State. We will briefly consider each of these positions.

The seventh section of the compact refers, so far as fishing is concerned, only to the Potomac River, and provides " that the right of fishery therein shall be common to and equally enjoyed by the citizens of both States," with the proviso that such common right shall not be exercised by the citizens of one State to the hindrance of the fisheries on the shores of the other State; and that the citizens of neither State shall have a right to fish with nets or seines on the shores of the other. It is conceded that the right of fishing, when not qualified, extends to the taking of both floating fish and shellfish. This concession, however, is of no importance as to fishing in the Potomac, as the offence charged in the case before us is limited to taking oysters in Pocomoke Sound, to which no reference is made in the section in question.

The eighth section is equally free from any reference to the

offence complained of. Its language is that "all laws and reg-
ulations which may be necessary for the preservation of fish,
or for the performance of quarantine, in the river Potowmack,
or for preserving and keeping open the channel and navigation
thereof, or of the river Pocomoke, within the limits of Vir-
ginia, by preventing the throwing out of ballast, or giving
any other obstruction thereto, shall be made with the mutual
consent and approbation of both States."

There is no ambiguity or obscurity in this language. It
simply provides that necessary laws and regulations for the
preservation of fish in the river Potomac, and for the perform-
ance of quarantine with respect to the river, and for preserv-
ing and keeping open the channel and navigation of that river
and of the river Pocomoke within the limits of Virginia, by
preventing the throwing out of ballast or giving any other
obstruction thereto, shall be enacted by the mutual consent
and approbation of the two States. There is nothing in these
provisions having any reference to fish of any kind in the
Pocomoke River or in the Pocomoke Sound, whether that
sound be deemed a part of that river or otherwise. As
observed by counsel, no clause of the compact having given
any right to Maryland to fish in Pocomoke River, there was
no reason why Maryland should be allowed to interfere in any
way by legislation or regulation for the preservation of its fish.

The case of *Hendricks* v. *Commonwealth,* 75 Virginia, 934,
939, decided by the Court of Appeals of that State, is cited
as authorizing the contention that a right to fish in the Poco-
moke River is given by the compact, equally with the right to
fish in the Potomac. The language of the court in that case
gives color to that view, but it is plain that the Court of Ap-
peals fell into a mistake in its judgment from a misquotation
of section eight of the compact, upon which it relied. The
language of the court is: "By article eight all laws and regu-
lations which may be necessary for the preservation of fish in
the river Potomac or the river Pocomoke, within the limits of
Virginia, shall be made with the mutual consent and approba-
tion of both States." It then adds as its conclusion: "The
effect of this article is to give the State of Virginia concurrent

jurisdiction with the State of Maryland over the Potomac from shore to shore and over that part of Pocomoke River which is within the limits of Virginia, to enact such laws, with the consent and approval of Maryland, as may be deemed necessary and proper for the preservation of fish in said waters." Turning to the eighth article of the compact, we find that it does not contain any language having reference to the preservation of fish in the Pocomoke River, and by this misquotation the error in the conclusion of the court followed. There being an error of citation, a decision founded upon the supposed correctness of the citation cannot be accepted as authoritative any more than a decision founded upon a mistranslation of a passage in an author will be followed when the mistake or error is discovered. There was no question before the Court of Appeals in the case cited, relating to fishing in the Pocomoke River. We shall hereafter refer to that decision on another point, in which it is not open to any criticism.

The question whether Pocomoke Sound is to be considered as part of Pocomoke River is immaterial in view of the conclusion we have stated, that the compact gives no right to the citizens of Maryland to fish in the waters of that river, and only refers to the river in providing that legislation or regulations, preserving and keeping open its channel free from obstructions, shall be enacted by the mutual consent and approval of the two States. But owing to the earnestness with which the identity of the river and sound has been pressed, it is proper to state that, after careful examination of the documentary evidence offered on the subject, we are clear that the river and sound were at the time the compact was made, and for many years preceding it, considered and designated as separate and distinct bodies of water, and after that date, down to what is termed the "Black-Jenkins award of 1877," they never lost their separate and distinct character and designation. And we agree with the statement of the court below, in considering this subject, that there is no map of these waters and no joint official document existing in relation to them, which has confounded the river with the sound, or claimed that the sound is the river or any part of the river

Pocomoke. The objection to the jurisdiction of the courts of Virginia to try the appellant for the offence charged does not find any support in the tenth section of the compact of 1785. That section only provides for the trial of citizens of Maryland in that State where offences are committed by them in Virginia upon citizens of that State. It was so held by the Court of Appeals of Virginia in *Hendricks* v. *Commonwealth,* above cited. The offence charged against the appellant, and for which he was tried and convicted, was one against the State of Virginia, and not one against any of her individual citizens. It was for catching and taking oysters in her waters, which were the property of the State, against her prohibitions, he being a citizen of Maryland.

The objections of the appellant to the jurisdiction of the county court of Accomack, in rendering judgment against him, being untenable, the judgment of the Circuit Court of the United States for the Eastern District of Virginia in refusing to discharge him from imprisonment for failure to pay the fine imposed upon him for a violation of the laws of Virginia and the costs of his prosecution, must be *Affirmed.*

Mr. Justice Harlan and Mr. Justice Gray concur in the result.