(Slip Opinion)

# Applicability of Section 410 of the Amtrak Reform and Accountability Act of 1997 to the Gateway Development Commission

New Jersey's proposed diversion of a portion of its annual payment to Amtrak to a bridge project subject to the authority of the Gateway Development Commission, an interstate entity established by New York and New Jersey, would violate section 410 of the Amtrak Reform and Accountability Act of 1997, which prohibits States from carrying out an interstate compact by using state or federal funds made available for Amtrak.

February 13, 2020

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF TRANSPORTATION

You have asked whether the interstate compact provision in the Amtrak Reform and Accountability Act of 1997, Pub. L. No. 105-134, § 410, 111 Stat. 2570, 2587–88 ("Amtrak Reform Act"), would prohibit New Jersey from diverting a portion of its annual payment to Amtrak to a bridge project subject to the authority of the Gateway Development Commission ("GDC" or "Commission"), which is an entity established by New York and New Jersey. This memorandum memorializes our prior conclusion that the proposed redirection of funds would have violated the terms of the Amtrak Reform Act. Section 410 of the Act prohibits States from carrying out an interstate compact by using state or federal funds made available for Amtrak. We concluded that the two States entered into an interstate compact to form the GDC and that the proposed diversion was therefore subject to the limitations of the Amtrak Reform Act.

New York and New Jersey created the GDC by passing reciprocal legislation last year. *See* Gateway Development Commission Act, 2019 N.J. Sess. Law Serv. ch. 195 (West) (July 22, 2019) ("N.J. Act"); Gateway Development Commission Act, 2019 N.Y. Sess. Laws ch. 108 (McKinney's) (July 22, 2019) ("N.Y. Act"). The States established the GDC to "facilitate" the expansion and renovation of rail lines in the Northeast Corridor ("NEC"), the rail system running from the District of Columbia through Massachusetts. *See* N.J. Act §§ 2, 4(a); N.Y. Act § 2, ¶ 1; 49 U.S.C. § 24905(a), (c)(1). In so doing, the States empowered the GDC to exert control over the use of funds committed to projects it is authorized

1

to facilitate.[1] *See* N.J. Act § 4; N.Y. Act § 3. Each State conditioned its legislation on the other State's enactment of legislation with "identical effect." *See* N.J. Act § 30(a); N.Y. Act § 10(a). Both laws further provided that each State must receive the "concurre[nce]" of the other State to amend or repeal its laws. N.J. Act § 25; N.Y. Act § 8. Under the terms of that legislation, each State has three representatives on the Commission; Amtrak also holds one seat.

In 2019, New Jersey Transit ("NJT"), the State's public transportation agency, requested a variance that would have allowed it to meet its financial obligations to an NEC bridge project subject to the GDC's authority by diverting a portion of the annual baseline capital charge payments that NJT otherwise would have owed to Amtrak.[2] *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Steven G. Bradbury, General Counsel, U.S. Department of Transportation at 1 (Oct. 1, 2019) ("Bradbury Letter"). The variance would have required the approval of the Northeast Corridor Commission ("NEC Commission"), *see id.*, which is a federal-state body established by Congress to promote rail planning and cooperation across the NEC, *see* 49 U.S.C. § 24905. The NEC Commission has adopted a Cost Allocation Policy, which permits rail owners and operators to request variances from the Commission's requirements for their baseline capital charges. *See* Northeast Corridor Commuter and Intercity Rail Cost Allocation Policy § 5.5.2.1–.2 (as amended June 19, 2019) ("Cost Allocation Policy"); *see also id.* § 1 (describing the Passenger Rail Investment and Improvement Act of 2008's direction to the NEC Commission "to create a cost-sharing arrangement for NEC infrastructure"). Members representing the Department of Transportation, "including the Office of the Secretary, the Federal Railroad Administration, and the Federal Transit Administration," serve

---

[1] The state laws define "facilitate" to mean "the planning, designing, financing, acquisition, development, redevelopment, expansion, construction, reconstruction, replacement, approval of works, lease, leaseback, licensing, consigning, asset management, optimization, rehabilitation, repair, alteration, improvement, extension, management, ownership, use and effectuation of the matters described in [each of the acts]." N.J. Act § 3; N.Y. Act § 2, ¶ 2(e).

[2] As part of phase one of the "passenger rail transportation project between Penn Station, Newark, New Jersey and Penn Station, New York, New York," referred to as the "Gateway Program," the bridge project is a component of the "Project" subject to the GDC's authority under the legislation enacted by the States. *See* N.J. Act § 3; N.Y. Act § 2, ¶ 2(h)(i).

on the NEC Commission, 49 U.S.C. § 24905(a)(1)(B), and thus were charged with considering whether the requested variance was permissible.

In the Amtrak Reform Act, Congress "grant[ed] consent to States with an interest in . . . intercity passenger rail service . . . to enter into interstate compacts to promote the provision of the service," including by retaining existing services, commencing new services, and performing capital improvements. Amtrak Reform Act § 410(a) (codified at 49 U.S.C. § 24101 note). While authorizing the compacts to facilitate the use of certain federal and state funds for intercity passenger rail service, Congress imposed a restriction to protect funding for Amtrak. Under the terms of the statute, "[a]n interstate compact established by States under sub–section (a) may provide that, in order to carry out the compact, the States may . . . use any Federal or State funds made available for intercity passenger rail service (*except funds made available for Amtrak*)." *Id.* § 410(b)(2) (emphasis added). The question therefore was whether the GDC was created by an "interstate compact," and if so, whether NJT's proposed variance would have diverted "funds made available for Amtrak" to carry out a rail service project subject to the GDC's authority.

The Amtrak Reform Act does not define the phrase "interstate compact," but the term "compact" has significance under the Compact Clause of the Constitution, which provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. Where a statute employs a term with "a well-known meaning . . . in the law of this country," we presume that Congress used the words "in that sense unless the context compels to the contrary." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911); *see also U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 461–62 (1978) (positing that "the Framers used the words 'treaty,' 'compact,' and 'agreement' as terms of art, for which no explanation was required").[3] Here, the words of the statute itself confirm that

---

[3] *See also Neder v. United States*, 527 U.S. 1, 21 (1999) ("[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." (internal quotation marks omitted)); *cf. Steele v. United States*, 267 U.S. 505, 507 (1925) (noting that the Court interprets "officer of the United States" in a statute in light of its constitutional meaning unless relevant context indicates otherwise); *United States v. Smith*, 124 U.S. 525, 531–32 (1888) (interpreting a statutory reference to "public officers" based upon the constitutional meaning of "officer[]," U.S. Const. art. II, § 2, cl. 2); *United States v. Mouat*, 124 U.S. 303, 306–07 (1888) (relying on

Congress has employed the term "[c]ompact" in its constitutional sense. Section 410(a) is entitled, "Consent to Compacts," and the statute provides that "Congress grants consent to States . . . to enter into interstate compacts" according to its terms. Amtrak Reform Act § 410(a). Plainly, Congress understood the statute to be a grant of the consent that Article I, Section 10, Clause 3 of the Constitution requires for States to enter into "Compact[s]" with each other.

The Supreme Court has held that not every interstate agreement constitutes an "Agreement or Compact" subject to the Compact Clause. *See Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). According to the Court, an agreement falls within the scope of the Clause only if it "tend[s] to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." *Id.* The "pertinent inquiry," the Court has explained, "is one of potential, rather than actual, impact upon federal supremacy." *Multistate Tax Comm'n*, 434 U.S. at 472. Under these precedents, "[i]nterstate agreements interfere with federal power . . . if: (1) they involve a subject matter which the Congress is competent to regulate . . . and (2) they purport to impose some legal obligation or disability" on state or federal governments or private parties. *Applicability of the Compact Clause to Use of Multiple State Entities Under the Water Resources Planning Act*, 4B Op. O.L.C. 828, 830–31 (1980) ("*Applicability of the Compact Clause*") (citing *Multistate Tax Comm'n*, 434 U.S. at 467–71; *Wharton v. Wise*, 153 U.S. 155, 171 (1894)).

The Court has also held that Congress's decision to authorize an interstate agreement on a subject matter that is within the scope of federal legislative authority would itself suffice to bring the agreement within the Compact Clause due to its inherent potential to impact federal supremacy. *See Cuyler v. Adams*, 449 U.S. 433, 440–41 (1981) (holding that "where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause"); *see also Wash. Metro. Area Transit Auth. v. One Parcel of Land in Montgomery Cty.*, 706 F.2d 1312, 1317 n.9 (4th Cir. 1983) (suggesting that, even if a state agreement would not independently qualify as an Article I "Compact," congressional consent turns a state agreement touching on an area

---

the constitutional definition of "Officers of the United States" when interpreting the statutory phrase "officers of the navy").

of Congress's legislative power into federal law). An agreement between two or more States may therefore constitute an interstate compact for constitutional purposes where it has been expressly authorized by an act falling within the appropriate scope of congressional authority.

Applying these precedents, we concluded that New York and New Jersey entered into an interstate agreement subject to the Compact Clause by enacting the reciprocal state laws establishing the GDC. The GDC has "several of the classic indicia of a compact," including the existence of a "joint organization or body" with regulatory authority, the inability of each State to "modify or repeal [the compact] unilaterally," and interstate "reciprocation." *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 175–76 (1985). The two States established the GDC as a governmental body, for public purposes. The GDC exercises governmental authority—it acts as a coordinating agency for federal, state, and private funding, and it has authority to enter into binding contracts with federal, state, and private entities; to acquire property for the projects, including through eminent domain; and to levy tolls and fees payable by project users. *See* N.J. Act § 4(a); N.Y. Act § 2, ¶ 1; *see also* N.J. Act §§ 4(a)(1)–(6), 7, 8; N.Y. Act § 2, ¶¶ 3, 6, 7. Each State further obligated itself to commit funds to rail projects that the GDC is authorized to facilitate. N.J. Act § 20; N.Y. Act § 2, ¶ 19.

In addition, while the two States did not sign a formal writing to embody their agreement, they did much the same thing by enacting reciprocal laws, on the same day, that were conditioned upon the other State's approval of a law with identical effect. N.J. Act § 30(a); N.Y. Act § 10(a); *see also Multistate Tax Comm'n*, 434 U.S. at 470 ("Agreements effected through reciprocal legislation may present opportunities for enhancement of state power at the expense of the federal supremacy similar to the threats inherent in a more formalized 'compact.'"). The state laws expressly require that each State must receive the "concurre[nce]" of the other State to amend or repeal its own law. N.J. Act § 25; N.Y. Act § 8.

The two States not only entered into an interstate agreement, but the agreement is one with the potential to encroach on "federal supremacy," even beyond the agreement's mere connection to a subject matter within the scope of Congress's constitutional authority to legislate. *See Multistate Tax Comm'n*, 434 U.S. at 468–70; *Virginia v. Tennessee*, 148 U.S. at 519. The GDC laws "impose some legal obligation or disability" on the State governments related to the regulation of rail operations. *Applicability of the Compact Clause*, 4B Op. O.L.C. at 830–31. There is no question

that Congress is "competent to regulate" the field of interstate rail opera-
tions. *Id.* The Amtrak Reform Act itself recognizes that "intercity rail
passenger service is an essential component of a national intermodal
passenger transportation system." Amtrak Reform Act § 2. In addition,
the compact imposes "legal obligation[s] or disabilit[ies]" on the States by
requiring them to fund the Commission's projects, empowering the Com-
mission to exercise regulatory powers across state lines, and requiring the
States to engage in "joint . . . operation[s]" that involve interstate rail
operations within the scope of federal legislative power. *See Applicability
of the Compact Clause*, 4B Op. O.L.C. at 831.[4]

The proposed variance demonstrated that the GDC's authority may di-
rectly impinge upon federal equities. New Jersey had proposed to meet its
financial obligations for a bridge project subject to the GDC's authority
by diverting funds from Amtrak, and as you explained, such a diversion,
if permitted, would have decreased Amtrak's available "good repair"
funds, which could have created a shortfall requiring replenishment from
other federal or state sources. *See* Bradbury Letter at 1, 3; Amtrak-NJT
BCC Variance Request for Portal North Bridge, Resolution 2019-R-##
(May 16, 2019) ("Draft Variance Request") (proposing a draft NEC
Commission resolution). Accordingly, we believe that the States' recipro-
cal laws establishing the GDC constitute an interstate compact under the
Compact Clause.

Under Supreme Court precedent, the States' reciprocal laws further
qualify as an interstate compact by virtue of Congress's express authori-
zation of the formation of "interstate compacts" promoting intercity

---

[4] In these respects, the GDC is quite different from the multistate administrative bodies
that the Supreme Court has held to stand outside the Compact Clause. *See Multistate Tax
Comm'n*, 434 U.S. at 471–72; *New York v. O'Neill*, 359 U.S. 1, 11 (1959) ("The Constitu-
tion of the United States does not preclude resourcefulness of relationships between States
on matters as to which there is no grant of power to Congress and as to which the range of
authority restricted within an individual State is inadequate."). In *Multistate Tax Commis-
sion*, for instance, the Court held that the States could establish such a body, even absent
congressional consent, where the commission lacked any "delegation of sovereign
power," could issue only "advisory" regulations, could be "withdraw[n] [from] at any
time," and did not otherwise intrude on federal supremacy. 434 U.S. at 457, 473–76. By
contrast here, as we have explained, the GDC exercises delegated state authority to take
binding action across state lines, such as condemning property and levying tolls, and the
reciprocal agreement occupies a field—interstate rail transit—that falls directly within
Congress's legislative purview.

passenger rail service. *See* Amtrak Reform Act § 410(a). An agreement may qualify as an interstate compact where Congress has consented to it by "authorizing joint state action in advance" and the matter is "an appropriate subject for congressional legislation." *Cuyler*, 449 U.S. at 440–41. The Amtrak Reform Act here provides express consent to New York and New Jersey to enter into a compact to provide intercity rail services, and that is plainly an appropriate subject for congressional legislation under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power . . . [t]o regulate Commerce . . . among the several States[.]"). Accordingly, even if the state laws establishing the GDC did not embody a potential intrusion on federal sovereignty, the federal law authorizing the agreement should itself be sufficient to bring it within the scope of the Compact Clause.

Having determined that the States entered into an interstate compact, we then considered whether NJT's proposal to divert funds that otherwise would have gone to Amtrak would have violated the terms of Congress's consent to that compact. In the Amtrak Reform Act, Congress authorized States to "use any Federal or State funds made available for intercity passenger rail service (*except funds made available for Amtrak*)." Amtrak Reform Act § 410(b)(2) (emphasis added); *see generally Cuyler*, 449 U.S. at 439–40 (Congress may condition its consent for compacts "on the States' compliance with specified conditions"). Consequently, NJT may not use any federal or state "funds made available for Amtrak" to fulfill its alternate funding obligations for projects that the GDC is authorized to facilitate.

We believe that NJT's proposed variance would have constituted a diversion of state "funds made available for Amtrak." Federal appropriations law speaks of funds being "made available" when they have been appropriated to be spent by a government entity for an authorized purpose, during an authorized period of time. *See, e.g.*, 3 Government Accountability Office, *Principles of Federal Appropriations Law* 3-9 (4th ed. 2017). The Amtrak Reform Act, however, does not apply simply to federal funds, but also to state funds, and the statute is specifically intended to regulate how the States make funding decisions in connection with interstate compacts relating to rail service. Accordingly, we do not believe that funds may be viewed as being "made available" for Amtrak only when Congress has appropriated them for that purpose as a matter of federal appropriations law.

Instead, we think that the question whether state funds have been "made available" should turn on the ordinary meaning of the phrase, which refers to funds that would otherwise be provided to Amtrak. *See* 1 *Oxford English Dictionary* 812 (2d ed. 1989) ("available": "capable of being made use of, at one's disposal, within one's reach"); *Webster's Third New International Dictionary* 150 (1993) ("available": "capable of use for the accomplishment of a purpose; immediately utilizable"; "that is accessible or may be obtained . . . : at disposal, esp. for sale or utilization"). The Fifth Circuit approached the phrase in a similar way in connection with the Individuals with Disabilities Education Act ("IDEA"), *see* IDEA Amendments for 1997, Pub. L. No. 105-17, § 101, 111 Stat. 37, 68 (codified at 20 U.S.C. § 1412(a)(18)(A)), which conditions federal funding on a prohibition against a State's reducing the amount of state financial support "made available" for special education and related services. *See Texas Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132–33 (5th Cir. 2018). The court accepted that the phrase referred to funds that were "capable of being used, not actually used," *id.*, and concluded that the State had breached that condition by appropriating fewer funds for that purpose in that year than the prior one, *id.* at 130, 132–35.

Where a State has committed under relevant agreements to make future payments to Amtrak, under federal law or otherwise, we believe that those funds have been "made available" for Amtrak. If funds were "made available" to Amtrak only when the state funds had been actually expended, or otherwise transferred to Amtrak, then the prohibition on state use of funds "made available for Amtrak" would have little effect, because such amounts that had already been transferred to Amtrak could hardly be diverted.

Under this standard, New Jersey's assumption of funding obligations to Amtrak "made [those funds] available for Amtrak" within the meaning of the Amtrak Reform Act. NJT's underlying obligation to Amtrak resulted from the NEC's Cost Allocation Policy, a congressionally mandated "policy for determining and allocating costs, revenues, and compensation for [NEC] commuter rail passenger transportation." *See* 49 U.S.C. § 24905(c)(1)(A). That Policy obligated New Jersey, as a participant in the NEC Commission, to make certain defined capital contributions. *See* Cost Allocation Policy § 1.6.1–.2. The Policy set requirements for the prioritization of baseline capital charges, which the NEC Commission calculates annually for each participant. *See id.* § 5.5.1–.2. NJT recognized that this prioritization formula would, in the absence of a variance,

require that the NJT funds at issue be provided "to Amtrak." *See* Memorandum for the Northeast Corridor Commission, from Joseph Quinty, NJ Transit, *Re: BCC Variance Request* at 1 (May 16, 2019) ("Quinty Memorandum"). The proposed variance would have enabled NJT to divert a portion of its payments set aside for NEC-related capital costs to pay down a portion of NJT's obligations to the aforementioned bridge project, ranging from $16 to $20 million per year, covering the period from 2019 through 2033. *Id.*; *see also* Portal North Bridge Variance Request at 1 (updated May 16, 2019) ("Variance Request Form") (explaining that the requested variance covered a fifteen-year period and included a $20 million reduction—or credit—applied to NJT's annual baseline capital charge obligation to Amtrak for fiscal years 2019 through 2029, followed by a $19 million credit for fiscal year 2030, reduced by $1 million annually through fiscal year 2033). Because NJT's request would have reduced the funds provided to Amtrak, we believe that the proposed variance would have presented precisely the kind of diversion prohibited by the Amtrak Reform Act.

We see two possible counterarguments, but we do not view either to be persuasive. First, one could argue that the NEC Commission's approval of a variance from the Cost Allocation Policy itself would reduce the amount of funds that NJT would be obliged to pay to Amtrak in the future. Under this reasoning, New Jersey's redirection of resources would not in fact reduce any funds "made available" to Amtrak; those reductions would arise solely from the discretionary decision by the NEC Commission. We think, however, that this argument ignores the fact that it was New Jersey itself that had requested a *variance* from its obligations for the purpose of meeting its new funding commitments under the GDC laws for the bridge project. Because the Amtrak Reform Act prohibits a State from entering into an interstate agreement that will take funds away from Amtrak, we think it similarly applies to prevent New Jersey from making a variance request to the NEC Commission that would have the same effect.

Second, because NJT's variance proposal addressed funding over a fifteen-year period, it could be said that the request concerned the projected expenditure of funds, and not simply funds that have already been "made available" to Amtrak. *See* Quinty Memorandum at 1. NJT calculated the future funding, beyond fiscal year 2019, that Amtrak would have been expected to receive based on NJT's *actual* payment obligations for fiscal year 2019 but a "*projected . . .* total payment amount" for fiscal year 2020. Variance Request Form at 1 (emphasis added). For the years fol-

lowing fiscal year 2020, the NEC Commission had not yet specified even the projected annual baseline capital charge spending obligations for each rail operator, so NJT's variance request for fiscal years 2021 through 2033 was based on NJT's assumptions regarding its annual future BCC obligations. *See id.* Nonetheless, the statutorily authorized NEC Cost Allocation Policy bound NJT to provide an agreed-upon amount of funding to Amtrak for infrastructure repairs, before diverting funds to third-level backlog projects such as the Portal North Bridge project. *See* Cost Allocation Policy § 5.5.2.1 (prioritizing basic infrastructure projects ahead of major backlog projects); Draft Variance Request arts. (B)–(D) (summarizing the Cost Allocation Policy requirement and asserting that the Portal North Bridge project is a "Major Backlog" project). Even though only current fiscal year funds are presently "available" for Amtrak, the future obligations are "expected," *see* Cost Allocation Policy § 4.2.1(2)–(3), and the current policy continues to bind parties until such time as the NEC Commission adopts a replacement policy.[5] Under the Amtrak Reform Act, NJT could not lawfully divert funds for use on projects the GDC is authorized to facilitate that, under the current Cost Allocation Policy, would have been "available" to Amtrak in future years. *See, e.g.*, *id.* § 2.2; Amtrak Reform Act § 410(b)(2) ("An interstate compact established by States under subsection (a) may provide that, in order to carry out the compact, the States may . . . use any Federal or State funds made available for intercity passenger rail service (except funds made available for Amtrak)."). Should the NEC Commission revise its Cost Allocation Policy in the future in a way that reduces NJT's obligations to Amtrak, then New Jersey may have more funds to direct toward GDC-facilitated projects. But under the Cost Allocation Policy as it currently exists, NJT was seeking a variance that would take away funds expected to be "made available" for Amtrak.

NJT's request made clear that, absent the proposed variance, Amtrak would have been the recipient of the capital charges that NJT owes. Vari-

---

[5] *See* Cost Allocation Policy § 2.2–.4; *see also id.* § 2.6 (providing for the imposition of financial penalties for parties who do not meet their payment obligations under the policy); 49 U.S.C. § 24905(c)(1)–(2) (requiring "Amtrak and public authorities providing commuter rail passenger transportation on the Northeast Corridor" to implement agreements, based on cost allocation policies, that are enforceable by the Surface Transportation Board); Cost Allocation Policy app. § 1.4.2.3 (providing that "if the policy expires, then the last year for which fully allocated costs were calculated according to the policy . . . will be used as the basis for calculating the current-year costs").

ance Request Form at 1. Because NJT had been obligated to make these payments to Amtrak under the NEC policy's prioritization requirements, we believe that the funds had been "made available" for Amtrak within the meaning of the Amtrak Reform Act. A diversion of these funds thus would have contravened the prohibition on using "funds made available for Amtrak" to "carry out the [interstate] compact." Amtrak Reform Act § 410(b)(2). Accordingly, we advised that the NJT's proposed variance would have been contrary to federal law.[6]

JENNIFER L. MASCOTT
*Deputy Assistant Attorney General*

---

[6] The NEC Commission ultimately approved a baseline capital charge variance that, like NJT's initial proposal, reprioritized baseline capital charges from basic infrastructure to backlog projects but, unlike NJT's proposal, stipulated that "the Gateway Development Commission is not authorized to receive or control the funds (or credit of funds) that are the subject" of the request. Resolution to Approve the NJT/Amtrak BCC Variance Request for Portal North Bridge, Resolution 2019-R-18 (Sept. 12, 2019).