## NATIONAL LIFE & ACCIDENT INS. CO., Inc. v. LEVERETT.

### No. 2693.

Court of Civil Appeals of Texas. Eastland.

Dec. 3, 1948.

Rehearing Denied Dec. 31, 1948.

Wagstaff, Harwell, Wagstaff & Alvis, of Abilene, for appellant.

Scarborough, Yates, Scarborough & Black, of Abilene, for appellee.

LONG, Justice.

Plaintiff, Ray C. Leverett, was the beneficiary in a policy issued by the defendant upon the life of Billie J. Leverett, son of the plaintiff. The company promised to pay the beneficiary $1,000 on death from natural causes and provided for payment of an additional $1,000 in event of death from bodily injuries sustained through purely accidental means. This suit was for the recovery of $1,000 under the double indemnity provision. The court submitted to the jury the following special issue: "Do you find from a preponderance of the evidence that the death of Bille J. Leverett resulted, directly and independently of all other

causes, by internal injuries revealed by autopsy, effected directly through external, violent and purely accidental means, and not as a result which followed ordinary means, voluntarily employed in a not unusual or unexpected way? Answer 'Yes' or 'No.'"

The jury answered the issue submitted in the affirmative. Based upon the finding of the jury, the court entered judgment in favor of the plaintiff. The insurance company has appealed.

The double indemnity feature of the insurance policy involved provides in part as follows: "Hereby Agrees to pay the Beneficiary (or Beneficiaries) of record under the Policy hereinafter referred to, in addition to the sum insured thereunder, a like amount in like manner (making a total of double the said sum) in the event of the Insured's death resulting within ninety days, directly, and independently of all other causes, from bodily injury evidenced by a visible contusion or wound on the exterior of the body or by internal injuries revealed by autopsy, effected directly through external, violent and purely accidental means, not as a result which follows from ordinary means, voluntarily employed in a not unusual or unexpected way and not caused by or contributed to directly or indirectly, or wholly or partially, by any disease or mental infirmity contracted either before or after the injury."

It will be observed that the trial court, in submitting the case to the jury, submitted only that portion of the above provision which provides for payment in the event of death caused "by internal injuries revealed by autopsy." There was nothing submitted to the jury with reference to bodily injury evidenced by a visible contusion or wound on the exterior of the body. Defendant, in various ways, both in the trial court and this court, challenges the sufficiency of the evidence to support the answer of the jury to the issue submitted. Defendant further contends that there was not sufficient evidence to raise an issue of fact and that the court should have instructed a verdict in its favor.

Before plaintiff can recover, he must establish that the death of Billie J.

Leverett resulted (1) directly and independently of all other causes, from internal injuries revealed by autopsy; (2) effected directly through external, violent and purely accidental means, (3) and not as a result which follows from ordinary means, voluntarily employed in a not unusual or unexpected way. The burden was upon plaintiff to establish all of the above facts by a preponderance of the evidence. In passing upon this question, we must view the evidence in the light most favorable to plaintiff.

The insured, Billie J. Leverett, was a recruiting officer in the United States Army. He died on June 18, 1947. The evidence discloses that the deceased was 27 years of age, in good health, except that his tonsils were infected. He entered the hospital for the purpose of undergoing an operation for the removal of his tonsils. The recognized tests were given him prior to the operation. It is undisputed that the insured was in perfect physical condition, so far as the doctors were able to determine, to undergo such an operation. The incidents surrounding the death of the insured is fully set out in the Report of Autopsy introduced in evidence, which reads in part as follows:

"Patient was brought by wheel chair to the EENT Clinic, 18 Jun 47. Two per cent novocaine with 19 gtts of 1:1000 epinephrine to the ounce was used as local anesthetic, a total of about twenty cc used to inject both tonsils. After waiting about five minutes for the anesthetic to take effect the right tonsil was dissected and snared out. Almost immediately after its removal the patient had a peculiar stare and when asked how he felt he remarked 'he felt kinda funny,' his pulse was taken and found to be rapid, in about one minute he began to have clonic and tonic convulsions. He was placed in a recumbent position, breathing became very shallow and pulse was rapid and strong, convulsions would occur about every 2–3 minutes lasting for about thirty seconds. About six to seven minutes after the onset of convulsions he became cyanotic and discontinued to breathe. One ampoule of adrenalin was given intramuscularly and artificial respiration was begun. After a lapse of about a minute the color returned to his face and lips and breathing began. There was no bleeding from the mouth or the tonsillar fossa, consultation was asked for and Col. Peterson advised the use of coramin and one ampoule was given intra-muscularly. The patient was taken by litter to his bed and the convulsions continued at about the same interval and cyanosis persisted, oxygen and artificial respiration was given along with 3 cc of coramine intravenously. After returning to his bed respiration and heart action ceased in about fifteen minutes, adrenalin was given into the heart muscle and artificial respiration continued for about forty minutes at end of which time patient pronounced dead.

Note: The gross autopsy examination shows nothing significant. The presence of a small amount of blood in the tracheo bronchial tree is to be expected following a tonsillectomy. There was no gross obstruction of the respiratory tract. The patient appeared to be in excellent health prior to the operation. The most likely cause of the convulsions and death of the patient is an abnormal reaction to procaine. This is very rare but when it does occur it usually takes the form of central nervous system stimulation with convulsions followed by respiratory or circulatory failure in the most severe cases."

It will be observed that the doctor who made the autopsy report was of the opinion that the most likely cause of the death of the insured was an abnormal reaction to procaine.

Drs. Estes and Snow, in answer to hypothetical questions based upon the autopsy report, gave as their opinions that the death of the insured was caused by the needle piercing an artery and injecting novocaine into the blood stream just prior to the attempted operation. They base their conclusion upon the time element, it being their opinions that if the insured had been hypersensitive to novocaine, that his death would not have occurred so quickly, but in view of the fact that he died within a short time after the injection of the novocaine, that it was their opinion that the needle pierced an artery, thereby injecting some of the novocaine into the blood stream of the insured, causing cerebral congestion.

■ We will first consider whether the evidence discloses that the death of the insured resulted from "internal injuries revealed by autopsy." The autopsy report reveals, under the heading "pathological diagnosis," that the central nervous system showed "cerebral congestion." Plaintiff pleaded that death of the insured was caused by an "edema and hemorrhage of the brain." Said doctors for the plaintiff were of the opinion that the injection of the needle into an artery thereby causing the novocaine to go immediately into the blood stream of the insured was the cause of his death. The autopsy report shows that immediately after the removal of the right tonsil the insured had a peculiar stare and when asked how he felt he said "he felt kinda funny." His pulse was found to be very rapid and in about one minute he turned blue and began to have convulsions. The medical testimony further reveals that there is a connection between the cerebral congestion revealed by the autopsy and the injection into the blood stream of the novocaine. Also that the novocaine in the blood stream would cause the insured to turn blue and have convulsions. It is our opinion that the evidence is sufficient to raise an issue of fact on the question as to whether the insured died from "internal injuries revealed by autopsy."

■ We will next consider whether the evidence shows that the death of the insured was caused by external, violent and purely accidental means. The occasion of the death of the insured was an operation for the removal of his tonsils. His death, according to the testimony of the doctors, was caused by the needle piercing an artery, thereby causing novocaine to enter his blood stream. The giving of the anesthetic and the removal of the tonsils were purposeful and not accidental, but the injection of the novocaine into the blood stream was unforeseen and unexpected. The evidence does not show exactly how the novocaine was injected into the artery or blood stream and in the very nature of things, this could not be shown. It is true that the doctor who injected the novocaine around the tonsil did not intend to strike an artery and put the novocaine in the blood stream. This was purely accidental. We believe that this phase of the case is controlled by International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282.

■ What has been said applies to that part of the issue inquiring whether insured's death was not a result which follows from ordinary means, voluntarily employed in a not unusual or unexpected way. The insured voluntarily submitted to the operation for the removal of his tonsils. An unexpected and unforeseen factor entered into the injection of anesthetic in that the needle pierced an artery and the novocaine was thereby injected directly into the blood stream. The authorities call this a vis major or an Act of God. When the vis major is closely connected with the means employed, as in this case, so as to be a part of what would otherwise have been a voluntary act, then the means employed, though voluntary, become accidental. International Travelers' Ass'n v. Francis, supra. It is our opinion that plaintiff discharged the burden of proof imposed upon him, that the finding of the jury is supported by evidence and the trial court did not err in entering judgment in favor of the plaintiff based thereon.

■ The policy provides that the double indemnity provision should be automatically suspended during the time the insured was enrolled in military service in time of war. It is contended by the defendant that it being undisputed that the insured was enrolled in military service at the time of his death and he having died in time of war, plaintiff could not recover. We do not agree with this contention. If the defendant intended to avoid the policy on such ground, it was necessary that it plead said provision. R.C.P. 94. No such pleading was filed. It is our further opinion that this provision has no application unless there was a causal connection between the military service and the death of the insured. 45 C.J. 930; 37 C.J. 546; 45 C.J.S., Insurance, § 938; 137 A.L.R. 1268. The insured died while undergoing an operation for removal of his tonsils. There was no connection between his service in the army and his death. Furthermore, the provision has no application for the reason that the war had ended at the time of the death of the insured. It is true there had

been no treaty of peace signed with Germany or Japan. Still, we think that there is not a state of war existing between these countries and the United States and was not at the time of the death of the insured. This point is overruled. See New York Life Ins. Co. v. Durham, 10 Cir., 166 F.2d 874.

■ By other points, defendant complains of the action of the trial court in admitting the testimony of Dr. Snow and Dr. Estes, that in their opinion the doctor who performed the operation on the deceased injected the anesthetic directly into the blood stream. Defendant says such testimony is speculative and based on a surmise and conjecture. It is our opinion that the testimony was admissible. In answer to hypothetical questions based upon the autopsy report which was in evidence, each of said doctors testified that it was his opinion that at the time the anesthetic was administered the needle pierced an artery and thereby caused the novocaine to enter the blood stream of the insured. This was proper expert testimony and admissible. See 19 Tex.Jur., 56, Sec. 37. Also Commercial Standard Ins. Co. v. Robinson, Tex.Com.App., 151 S.W.2d 795.

All points raised by the defendants have been carefully considered. We find no reversible error in any of them and they are all accordingly overruled.

The judgment of the trial court is affirmed.