## Morgan Estate

*Flood, Brown & Kasper*, for petitioner.

*Nelson A. Bryan*, for respondent.

*Gifford Cappellini*, guardian ad litem, for Jane Morgan.

JONES, P. J., October 13, 1954.—On January 31, 1951, Enoch E. Morgan, a soldier in the military service of the United States, died in a "prisoner-of-war" camp in Korea.

The register of wills of this county admitted to probate as decedent's last will a certain writing executed by decedent on November 2, 1950. Under the terms of this will, decedent's entire estate was bequeathed and devised to his niece, Jane Ann Morgan, now aged eight years.[1]

Margaret Schrode, decedent's sister, has appealed from the probate of the will. The attack on the validity of the will is twofold: (1) Decedent, being under 21 years of age, lacked testamentary capacity by virtue of section 1(a) of the Wills Act of 1947 (20 PS §180.1(a)), and (2) even though decedent was over 18 years of age and in the armed forces of the United States in active service when he executed this will, section 1(b) of the Wills Act, supra, is inapplicable because decedent's military service was not during any "war" in which the United States was engaged: i.e., the Korean conflict was not a "war."

All parties in interest were represented at the hearing on this appeal, the minor, Jane Ann Morgan, being represented both by counsel and a guardian ad litem.

In lieu of testimony the parties stipulated upon all the essential facts involved in this litigation. This stipulation is as follows:

1. All parties in interest are before the court.

2. The will was executed November 2, 1950, ad-

---

[1] In the event that decedent died intestate, the following persons would be entitled to share in his estate: Margaret M. Schrode (a sister), Carlton Morgan (a brother) and William Morgan (a brother and father of Jane Ann Morgan).

mitted to probate on April 7, 1954, and letters testamentary thereon issued to Harry Watkins.

3. On the date the will was executed—November 2, 1950—decedent was 19 years of age, having been born June 17, 1931.

4. On the date the will was executed decedent was a member of the United States armed forces on active service in Korea.

5. Decedent died January 31, 1951, in a prison camp in North Korea.

The determination of this appeal rests solely upon the answer to the following question: On November 2, 1950, was the United States engaged in a "war" within the language of section 1(b) of the Wills Act of April 24, 1947, P. L. 89, supra? This section reads as follows:

"(b) Persons in Military Service and Mariners. During any war in which the United States is engaged, a person of sound mind eighteen years of age or older and being in the Armed Forces of the United States in active service at home or abroad, or being a mariner on land or at sea, may by will dispose of all his real and personal estate subject to payment of debts and charges, and may thereafter revoke such will whether or not the United States is engaged in war and whether or not he is still in such service or is a mariner."

Appellant relies principally upon the interpretation placed upon the Korean conflict by our Supreme Court in Beley v. Penn. Mutual Life Insurance Co., 373 Pa. 231, and Harding v. Penn. Mutual Life Insurance Co., 373 Pa. 270. It naturally follows that if the factual situation presented in those cases is similar to the instant factual situation, we are bound to follow the decisions of the Supreme Court.

Appellee takes the position that the Beley and

Harding decisions are not controlling of the instant case: that in the Beley and Harding cases the Supreme Court was interpreting the word "war" as used in an insurance contract between an insurer and insured, whereas, the court now is asked to interpret the intent of the legislature in its use of the word "war" in a statute.

It is my opinion that neither the Beley nor the Harding decisions are determinative of the present issue. That different factual situations were presented in the Beley and Harding cases is clear— in the latter, decedent's death, although it occurred while decedent was in the military service, did not result from the military service, while in the former, decedent's death did result from his military service. However, in both cases the same question was involved—whether the conflict in Korea was a "war" within the meaning of that word as used in an insurance policy. My analysis of both opinions is that the Supreme Court reached the following conclusions: (1) Although the Congress, by various enactments, had recognized the presence of United States military forces operating in Korea, yet the Congress had never declared war and the United States military forces were dispatched to Korea by presidential order; (2) since the exclusive power to declare war under the Constitution rests in the Congress, in the absence of any declaration of war by the Congress, the conflict in Korea was not a "war" in the legal or constitutional sense; (3) if an ambiguity arises from the use of the word "war" in an insurance contract—whether "war" in the legal or the popular sense was intended—the well-established rule of construction requires that such ambiguity should be resolved against the insurer and in favor of the insured, particularly since the contract under interpretation was a life insurance policy—a highly technical in-

strument presumably drawn by the insurer's legal experts.[2]

I do not interpret either the Beley or the Harding decisions as authority for the proposition that the word "war" must always be construed as meaning a "declared war" in the legal sense and never in its popular sense.

The instant inquiry seeks a determination of the intent of the legislature in the use of the phrase "During any war in which the United States is engaged" in section 1(b) of the Wills Act of 1947, supra. An explanatory comment from the Report of Joint State Government Commission of the General Assembly states that section 1(b) changes the law, inter alia, as follows:

"It permits a person in the armed forces of the United States or a mariner, in time of war, to dispose of real as well as personal estate if he is eighteen years of age or older."

The Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551, provides that if the words of a law are free of ambiguity, its letter should not be disregarded under the pretext of pursuing its spirit, but that when the words of the law are not explicit the intention of the legislature may be ascertained by considering other matters. Among the matters which may be considered are the occasions and necessity of the law, the circumstances of its enactment, the mischief to be remedied and the object to be attained, the former law upon the same subject and the con-

---

[2] It is of interest to note the interpretation placed by appellate courts in other States on the word "war" as used in insurance policies: Langlas v. Iowa Life Ins. Co., 63 N. W. 2d 885 (Iowa); Stanbery v. Aetna Life Ins. Co., 26 N. J. Super. 498, 98 A. 2d 134; Darnall v. Day, 240 Iowa 665, 37 N. W. 2d 277; Weissman v. Metro. Life Ins. Co., 112 F. Supp. 420 (Cal.); Western Reserve Life Ins. Co. v. Meadows, 152 Texas 559, 261 S. W. 2d 554; N. Y. Life Ins. Co. v. Durham, 166 F. Supp. 844 (N.Y.).

sequences of a particular interpretation. In attempting to ascertain the legislative intent in this particular matter, consideration must be given briefly to the legal status of wills popularly referred to as "soldiers' and sailors' wills."

Mariners and soldiers have, apparently, since early Roman and English law been regarded as a special class privileged to dispose of personalty by oral unwitnessed wills. In 1590 Swinburne stated that Julius Caesar initiated a special privilege for soldiers that they might make their wills in any manner that they could.[3] The early English law granted to mariners and soldiers the right to make oral unwitnessed wills disposing of personalty.[4] The late Judge Gest in Henninger's Estate, 30 Dist. R. 413 in an exhausive opinion considered the law of England and Pennsylvania on this subject and reached the conclusion that mariners at sea and soldiers in actual military service had the same privilege to make an oral testamentary disposition of personalty that they would have enjoyed if the English statute of frauds, the Act of 1705, 1 Sm. L. 33, the Act of April 8, 1833 and the Act of June 7, 1917, P. L. 403, had never been passed since all of these statutes expressly excluded such wills.[5] Until the Wills Act of 1947 "any mariner being at sea, or any soldier being in actual military service 'might' dispose of his movables, wages and personal estate as he might have done before the making of this act" (Act of 1917, supra)—i.e., he could make an oral testamentary disposition of personalty.

---

[3] "Soldiers' and Sailors' Wills" by Atkinson, vol. 28, A. B. A. Journal, p. 753, et seq. (Nov. 1942); Henninger's Estate, 30 Dist. R. 413.

[4] Ibid: Fiduciary Review (March 1944), "Wills—Soldiers and Sailors—Minority—Oral Statements—Formalities."

[5] Act of 1705, 1 Sm. Laws 33, 1 Stat. at L. 198; Act of April 8, 1833, P. L. 249, 4 PS §5128; Act of June 7, 1917, P. L. 403, 20 PS §194.

This privilege granted to mariners and soldiers was valid even though the mariner or soldier be a minor. Professor Atkinson in his article, "Soldiers' and Sailors' Wills," supra states:

"Under the Roman law, a soldier below the ordinary testamentary age could not make a soldier's will, and Swinburne says that the same was true in English law. However, it must be remembered that a Roman citizen could make a will on attaining puberty, and by the English law, the age at which males could bequeath personalty was fourteen. The English Wills Act of 1837 provided that no will made by any person under twenty-one should be valid. However, a soldier who was a minor could make a will in England even after that act. The reason for this holding was that the Wills Act also preserved the preexisting privilege of soldiers to make wills and, hence, soldiers were not bound by the general age requirement of the act."

In Henninger's Estate, supra (pages 416-17), it was stated:

"A male infant of the age of fourteen, having attained the age of puberty, had the legal capacity to make a will of personalty.

"This was well settled in the Roman law and adopted by the Ecclesiastical Court in England, Narbona de AEtate, Annus Decimus Quartus, qu. 46; Swinburne, Part II, §2; Gibson's Codex, Title xxiv, ch. 1; 2 Blackstone 497; Godolphin's Orphan's Legacy, 276; I Browne Civil Law, 296. Co. Litt., 89 b, is somewhat ambiguous as to the legal testamentary age, but any doubt is entirely removed by Francis Hargrave's note 83, which shows that prohibitions were refused by the King's Bench to restrain the Ecclesiastical Courts from allowing wills made at such early ages, and the doctrine was recognized and adopted by chancery: Sheppard's Touchstone, 403; Smallwood v. Berthouse, 2 Show. 204 (34 Car. II) ; Anon. Comerbach,

50 (3 Jac. II) ; Hyde v. Hyde, Gilbert Eq. 74 (1710) ; Anon. Mosely, 5 (1726) ; Williams on Executors, Part I, Book 2, ch. 1 §1. It was not until 1837 that the common law rule as to age of majority, twenty-one, was applied to testamentary capacity by the Stat. 1 Vict., ch. 26 §7; 3 Holdsworth, History of English Law, 428. In Pennsylvania, so far as I can find, this restriction is imposed for the first time by our Act of 1833.

"I consider it, therefore, as established beyond a reasonable doubt that in England and in this State, prior to any legislation that might affect the case, a male minor over the age of fourteen years might make a valid oral will of personal property. We must have recourse to the common law until that law has been changed by statute. It was so held as to the common law age of testamentary capacity in Davis v. Baugh, 1 Sneed (Tenn.) 477 (1853), and Deane v. Littlefield, 1 Pick. (Mass.) 239 (1822).

"In the latter case it was said: 'No doubt the instances are rare of wills made by minors, because it rarely happens that they have property to dispose of, and when they have, they are generally willing that the wise disposal of the law should have its course; but a common law right cannot be taken away from one individual merely because others have not chosen to exercise it. Neither the legislature of the colony, province or commonwealth have seen fit to abolish this right, and certainly a court of law cannot do it.' "

It would, therefore, seem evident that prior to the Wills Act of 1947 in Pennsylvania a soldier in actual military service or a mariner at sea, if over 14 years of age could make a valid oral will of personalty.[6]

---

[6] "If the required testamentary intent could be shown, the will could be oral and the testator could be as young as fourteen": Bregy, "Intestate, Wills and Estates Acts of 1947," p. 2052.

Section 1(b) "for the first time since Julius Caesar subjects the wills of soldiers and mariners to the formal requirements for ordinary wills."[7] This section makes a concession to the historical privilege granted to this class by permitting members of the class over 18 years of age to make a will disposing not only of personalty but realty. Section 1(b), in effect, raises the age required of this class from 14 to 18 years and makes invalid any oral unwitnessed will of personalty made by members of the class.

If consideration be given to the occasion and necessity for the enactment and the circumstances under which it was passed, it must be noted that the legislature of 1947 was the first legislative assembly following the cessation of hostilities in World War II. Each of the legislators was aware that thousands of young men and young women, volunteers and conscriptees, between the ages of 18 and 21 years, had been engaged in that titanic struggle and subjected to all the perils and hazards of warfare. Persons in that age group were placed by the circumstances of actual warfare in situations where death was omnipresent and yet under the law such persons lacked testamentary capacity, except for a post-mortem disposition of their personalty. The legislature in an attempt to correct this inequity—if these persons were old enough to fight they should be considered old enough to dispose by will of both their real and personal property—passed section 1(b).

What did the legislature contemplate by the use of the word "war"? Was testamentary capacity to be recognized only in those between the ages of 18 and 21 years who made wills during the course of an armed conflict solemnly declared by the Congress to be a "war", or during any armed conflict in which United States military forces were subjected. to the

---

[7] Bregy, supra, p. 2052.

hazard of loss of life while engaged in fighting the battles of their country?

Decisions under prior statutes in this and other jurisdictions interpreting the "actual military service" requisite of a soldier before being granted the privilege of making an oral will of personalty are of aid only insofar as they indicate the trend of the courts to limit the privilege to soldiers in activities where they were subject to peril of life.[8]

---

[8] "Assuming that the person is one who might come within the favored class, the next question is whether, at the time of making his will, he was engaged in an activity which the statute specifies. There has been more litigation on this subject than on all other phases of soldiers' and sailors' wills, combined. The Statute of Frauds says that the soldier must be 'in actual military service' and most American statutes use the very same words. In the Roman law, the privilege was granted only to soldiers 'on expedition'. Many Anglo-American cases declare that the words 'in actual military service' must be construed to mean the same thing as 'on expedition' in the Roman law. In the leading English case of Drummond v. Parrish, it was contended that one 'in actual military service' meant a soldier on full pay as distinguished from one who was retired or on half pay. This interpretation was rejected by the court, holding that a major general stationed in England in peace time was not privileged to make an informal soldier's will. Ever since it has never been doubted but that war is necessary for the existence of the soldier's privilege, and that he must be taking some part in the hostilities or some step toward participation.

"At the time of the Boer War, the English decisions held that soldiers who had embarkation orders were eligible to make soldiers' wills. The older cases both in England and America indicated that those in barracks who had not received orders to depart for the front were not privileged. A recent English decision established an unattested will of a soldier who at the time of execution was stationed in a camp and killed by an enemy bomb two days later. On the other hand the informal will of a major of the Dental Corps, made at his home where he was later killed by a bomb, was denied probate. This was upon the ground that his situation did not deprive him of the opportunity of securing a regular will and the same reasoning seems to apply to members of the Home Guard. Recent American and dominion decisions have permitted soldiers' wills in training camps, though there was then little or no ap-

Considering the statute in the light of the past law on the subject, the circumstances surrounding its enactment and the purpose of its passage, I conclude that the legislature of 1947 in its use of the word "war" did not intend "war" in the legalistic sense of a solemn "declared" war and that the testamentary capacity of persons in the armed forces between the ages of 18 and 21 should not depend upon formal congressional action in declaring a National conflict to be "war" in the formal sense.

Decedent went to Korea under orders of the United States Government; he was transported, clothed, fed, equipped, armed at governmental expense and at all times acted under orders of the United States Government; he was engaged in fighting for the integrity and security of our Nation, and not upon a venture or mission of his own. The peril to life on the battlefields of Korea during the conflict to which our armed forces were committed by presidential order was just

---

preciable danger from the enemy. This seems sound for, in the past, the facilities for making ordinary wills in training camp have not been adequate.

"In the case of sailors it is not necessary that there be any war; the perils of the sea are sufficient to warrant the privilege. This is manifested in the language of the statutes which usually require only that the sailor be 'at sea.' There is a liberal Irish case which holds that one on shore after receiving a definite call for ship duty comes within the statute. Other cases hold that one on board at his home port may not make a sailor's will. However, a sailor's will may be made at an intermediate port while on board ship, or even while on land leave. When the words 'at sea' are used in the act, this has been held to refer to any waters where the tide ebbs and flows but not to inland rivers or lakes. It seems strange that the privilege does not exist in favor of mariners on our Great Lakes. It should be noted that the Michigan act says 'on shipboard,' which would doubtless apply to fresh waters and to vessels while in port": Thomas E. Atkinson, "Soldiers' and Sailors' Wills," supra. See also: Smith's Will, 6 Phila. 104; Hubbard v. Hubbard, 8 N. Y. 196.

as real and present as the peril to life on the battle-fields of Okinawa and Guadalcanal during the conflict to which the armed forces were committed by congressional action. The purpose of both conflicts was the protection of the integrity and security of this Nation and in pursuit of that purpose lives were sacrificed. The phrase, "It is not what you call it, but what it is", seems particularly applicable to this situation. War, whether it be by congressional or presidential action, subjects men to dangers which may cost them their lives. The failure of the Congress to formally recognize the existence of a state of war in Korea did not detract from the orbit of danger to which our armed forces were subjected in that land. How ironical it must appear to any veteran of the Korean conflict to be told that that conflict was not a war because the Congress had not passed a resolution declaring it to be a war.

"War" need not always be interpreted in the legalistic sense, but may be interpreted in the popular sense. Some courts have taken the position that in matters of the public interest and concern war should be interpreted in the constitutional sense, but that in matters of private rights and relationships war should be interpreted in its popular sense.[9]

Shortly after the decisions in the Beley and Harding cases the legislature of 1953 amended section 1(b) of the Wills Act of 1947 by eliminating therefrom the phrase "During any war in which the United States

---

[9] In Schaffer et al. v. Oldak et al., 12 N. J. Super. 80, 78 A. 2d 842, where a will provided that the trustees of a fund should accumulate the income and hold intact the principal until the "end of the war", the court construed "the end of the war" to refer to the actual cessation of hostilities rather than the formal execution of a treaty of peace. See, also: Atlantic Refining Company v. Graham, 74 D. & C. 433; Berg v. Berg, 13 N. J. Super. 479, 80 A. 2d 584; Darnall v. Day, supra.

is engaged." [10] While this amendment cannot retroactively become applicable to this case, yet it is indicative of a legislative intent to effect a change of legislative rights.[11] The only possible reason for the amendment of 1953 was the elimination of any possible controversy such as presented in the instant case wherein the word "war" might be interpreted in a legalistic sense, rather than the popular meaning.

The conclusion herein reached upholds the validity of this will and avoids an intestacy, a canon of construction in itself favored by the law: Walker Estate, 376 Pa. 16, 24; Siple et ux. v. Greumelli et al., 357 Pa. 237, 241; Jacobs' Estate, 343 Pa. 387, 393.

In my opinion the legislature in 1947 intended to grant the capacity to make a will to those persons in the armed forces over the age of 18 years while engaged in war in the popular sense and during a conflict wherein the armed forces of the United States were subjected to the hazard of loss of life.[12] In line with this view as the proper construction of section 1(b) of the Wills Act of 1947, it is my opinion that Enoch E. Morgan executed this will while the United

---

[10] Act of May 22, 1953, P. L. 216, 20 PS §180.1.

[11] Fidelity Trust Company v. Kirk et al., 344 Pa. 455, 458; Funk v. Buckley & Company, Inc., et al., 158 Pa. Superior Ct. 586, 593; Sekel v. Fagenemma, 179 Pa. Superior Ct. 621, 624.

[12] In commenting on section 1(b) it has been said:

"Whether the courts will adopt a technical or a realistic construction of the word 'war' is impossible to predict. Probably less trouble will be encountered in the long run if the popular meaning of the word is adopted and the fact of war determined in each case independently of what Congress or the President has declared to be the theoretical condition. As can be seen from a moment's reflection, the appearance of certainty presented by a technical construction is deceiving. A full scale war might never be declared, and on the other hand we might be theoretically at war with a nation years after the last gun has been fired": Bregy, "Intestate, Wills and Estates Acts of 1947." p. 2053.

States was engaged in a war and that the will is a valid instrument.

Now, October 13, 1954, at 3 p.m., I hereby dismiss the appeal of Margaret M. Schrode from the decision of the register of wills admitting to probate as the last will of Enoch E. Morgan the instrument executed on November 2, 1950, and granting letters testamentary to Harry Watkins.