IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 02-0090

════════════

 

Utica National Insurance Co.
of Texas, Petitioner,

 

v.

 

American Indemnity Co. and
Texas Property &

Casualty Insurance Guaranty
Association, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Third District of
Texas

════════════════════════════════════════════════════

 

 

Justice Hecht,
joined by Justice Owen,
dissenting.

 

 

Four patients alleged that they contracted
Hepatitis C from injections of fentanyl, an anesthetic, that was
contaminated by a surgical technician, David Wayne Thomas, while stealing the
drug for his own use.  The patients
asserted that their respective treating physicians, and the other
anesthesiologists with whom they associated in Mid-Cities Anesthesiology, P.A. C ten of them altogether C were negligent in not securing the
drug and supervising Thomas so as to prevent the contamination.  The association and its members carried
commercial general liability (CGL) insurance and professional liability
insurance.  The patients have settled,
and the only remaining dispute is between the insurers over which of them was
obligated to defend and indemnify the claims. 
One of the CGL carriers, Utica National Insurance Co., contends that the
claims were not covered by its policy. 
The other CGL carrier, American Indemnity Co., and the receiver for the
professional liability carrier, Texas Property and Casualty Insurance Guaranty
Association, disagree.

In my view, if the association and its member
physicians were negligent in failing to prevent the contamination of a drug
they used in medical treatment, it was because they breached a professional
standard of care, whether the injured patients were theirs or their associates=, and not because they breached some
ordinary duty of care that they may have owed irrespective of their medical
training and practice.[1]  Utica concedes in this Court that it might be
possible for a physician to fail to secure drugs properly and yet violate only
an ordinary duty of care, not a professional standard.  Perhaps so. 
Maybe allowing liquid drugs to leak or pills to spill so that someone
slips and falls does not involve a professional standard of care.  Utica concedes the point in reliance on the
strength of its argument that even if the patients=
injuries were caused in part by non-professional negligence, such negligence
was necessarily concurrent with professional negligence and therefore outside
the coverage of its CGL policy, based on the line of cases the Court cites.[2]  The Court takes Utica=s
concession[3] and then
disagrees with its argument, concluding that the patients= injuries may have been caused by
non-professional negligence only. 
I cannot see how it is remotely possible for a physician to be negligent
in preserving the purity of medications administered to patients by himself and
those with whom he associates and yet not be in breach of a professional
standard of care.

Thus, I would hold that the patients= claims were for professional
liability, against which Utica had no obligation under its CGL policy to defend
or indemnify.  The Court does not
foreclose this result but remands for fact findings.  If I am correct C
if the association and its members could not have been negligent without
violating a professional standard of care C
the outcome will eventually be the same. 
I remain troubled by the way the Court goes about reading insurance
policies, which we constantly reiterate must be interpreted and construed like
other contracts,[4]
but which hardly ever are because courts approach them, not as neutral arbiters
of words on a page, but in hopes there will be coverage.

The standard form Texas Businessowners Policy of
commercial general liability insurance that is available to businesses of all
types and that Utica National Insurance Co. issued to Mid-Cities
Anesthesiology, P.A. and its ten member anesthesiologists excluded from
coverage A>[b]odily injury= . . . due to rendering or
failure to render any professional service@.  According to the Court, what the exclusion
really means is that the policy does not cover A[b]odily
injury . . . due to rendering or failure to render any professional
service in breach of the professional standard of care@. 
This is by no means a simple clarification; the Court=s added phrase changes the meaning
significantly.  As written, the exclusion
applies to any professional service; as rewritten by the Court, it
applies only to any negligent professional service.  Why? 
Because, the Court explains, Adue
to@ implies a closer causal connection
than Aarising
out of@, another
phrase used in the policy.  The Court may
be correct about the difference between the two phrases.  A patient=s
slip and fall in a physician=s
office might be argued to Aarise
out of@ the
rendition of professional services simply because the patient was on the
premises for purposes of treatment but could not be said to be Adue to@
the rendition of professional services unless the medical treatment (or failure
to treat) directly caused the injury, say, by making the patient woozy and apt
to fall.  But to use this difference in
the connection between events to define Aprofessional
services@ is
simply a non sequitur.  There is no
rational relationship between the meaning of Adue
to@ and the meaning of Aprofessional service@. 
Whether Aprofessional
service@ means any
professional service or only professional service in breach of a professional
standard of care has nothing whatever to do with whether Adue to@
means the same thing as Aarising
out of@.  The policy could have been written to exclude
coverage for bodily injury any one of three ways, either:

 

(1)       due to rendering or failing to render any
professional service; or

(2)       arising out of rendering or failing to
render any professional service; or

(3)       due to rendering or failing to render any
professional service in breach of the standard of professional care.

 

The Court concludes that because (1) does not mean (2), (1) must
mean (3).  It is not clear why, assuming
(1) does not mean (2), (1) should not mean (1).

Nor is it clear why either of the two generalities
support its construction of the policy language.  The Court says it A>must adopt the construction of an
exclusionary clause urged by the insured as long as that construction is not
unreasonable=@.[5]  We have made clear that this is true only if
the exclusionary clause is ambiguous:

 

Where an ambiguity involves an exclusionary provision of an
insurance policy, we Amust
adopt the construction . . . urged by the insured as long as that
construction is not unreasonable, even if the construction urged by the insurer
appears to be more reasonable or a more accurate reflection of the parties= intent.@[6]

 

If an exclusionary clause is clear, we cannot ignore its plain
meaning just because someone can imagine some other construction that is not
unreasonable.  No one argues in this case
that the exclusionary clause is ambiguous. 
Importantly, it is not the resulting coverage that must not be unreasonable,
otherwise policy language would not mean much. 
Earlier this Term, in American Manufacturers
Mutual Insurance Co. v. Schaefer, the insureds argued that an insurer=s obligation under a standard
automobile policy to Arepair@ a damaged vehicle should include
compensation for loss in value.[7]  Such coverage would not be unreasonable, but
it cannot fit within the meaning of Arepair@. 
Likewise, there is nothing unreasonable about the broader coverage the
Court creates by rewriting the exclusionary clause here.  Utica could reasonably have offered it, and
Mid-Cities Anesthesiology could reasonably have bought it.  But the rule is that the insured=s construction of the exclusionary
clause C that is,
the reading of the words on the page C
must not be unreasonable.  And it is
simply not a reasonable construction of the English language to say that Aany professional service@ means the same thing as Aany professional service in breach of
the professional standard of care@.  AAny@ does not mean Asome@, even in insurance policies.  

The Court adds: AReasonable
expectations are often affected by the conditions surrounding the formation of
the policy language and by the type of clause at issue.@[8]  I must confess that I have no idea what the
Court intends by this statement, which is made without reference to
authority.  Standing alone, it is a
truism: reasonable expectations are, indeed, often affected by such
things.  But the statement might be taken
to imply that someone=s
reasonable expectations C
probably an insured=s, and
probably not an insurer=s
C have something to do with determining
the coverage afforded despite the policy language.  That implication risks tension with the Court=s prior pronouncement that A>an
insured may not complain that his or her reasonable expectations were
frustrated by policy limitations which are clear and unambiguous.=@[9]  No one argues here, and the Court does not
conclude, that the exclusionary clause in Utica=s
policy was ambiguous.  The policy form
was prescribed by the State Board of Insurance, the conditions surrounding the
formation of the policy language are unknown, the clause is what it is, and one
can search the whole policy from beginning to end and still not find anything
to indicate that the Board or Utica or Mid-Cities Anesthesiology intended for Aany professional service@ to mean anything other than just that.

In Schaefer, a unanimous Court wrote: Awe may neither rewrite the parties= contract nor add to its language.@[10]  The Court is no more careful in applying its
own opinions than it is in construing insurance polices.  What the Justices
in today=s
majority really meant by the assertion in Schaefer was that Awe may neither rewrite the parties= contract nor add to its language unless
we believe we should.@  One way or the other, the Court must add a
few words to its Schaefer opinion so that it can add a few words to
Utica=s policy.

I respectfully dissent.

 

                                                                             

Nathan L. Hecht

Justice

Opinion delivered: July 9, 2004











[1] Cf. Harris Methodist Health Sys. v.
Employers Reinsurance Corp., No. 3:96‑CV‑0054‑R, 1997
U.S. Dist. Lexis 23660 (N.D. Tex. July 25, 1997) (holding that claims against a
hospital for injury caused by David Wayne Thomas=s criminal
activities were professional liability claims).





[2] Ante at ___.





[3] Ante at ___ n.3.





[4] Ante at ___ (citing National Union Fire
Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (AInsurance policies are controlled by rules of
interpretation and construction which are applicable to contracts generally.@); accord, e.g., American Mfrs. Mut.
Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003) (AWe interpret insurance policies in Texas according to
the rules of contract construction.@); Progressive
County Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 (Tex. 2003) (AIt is well settled that the general rules of contract
construction apply to the interpretation of insurance contracts.@); Texas Farmers Ins. Co. v. Murphy, 996 S.W.2d
873, 879 (Tex. 1999) (AIn Texas, insurance contract interpretation is
governed by general contract interpretation rules.@); Balandran v. Safeco Ins. Co. of Am., 972
S.W.2d 738, 740-741 (Tex. 1998) (A[I]nsurance
contracts are subject to the same rules of construction as other contracts.@); Forbau v. Aetna Life Ins. Co., 876 S.W.2d
132, 133 (Tex. 1994) (AInterpretation of insurance contracts in Texas is
governed by the same rules as interpretation of other contracts.@); National Union Fire Ins. Co. v. Hudson Energy
Co., 811 S.W.2d 552, 555 (Tex. 1991) (AGenerally,
a contract of insurance is subject to the same rules of construction as other
contracts.@); Western Reserve Life Ins. Co. v. Meadows,
261 S.W.2d 554, 557 (Tex. 1953) (AIt is
the settled law in this state that contracts of insurance in their construction
are governed by the same rules as other contracts, and that terms used in them
are to be given their plain, ordinary and generally accepted meaning unless the
instrument itself shows them to have been used in a technical or different
sense.@).





[5] Ante at ___ (citing National Union Fire
Ins. Co., 811 S.W.2d at 555).





[6] Balandran, 972 S.W.2d  at 741 (alteration in original) (quoting National
Union Fire Ins. Co., 811 S.W.2d  at
555).





[7] 124 S.W.3d 154, 162 (Tex. 2003).





[8] Ante at ___.





[9] Murphy, 996 S.W.2d at 878 (Tex. 1999) (quoting
McAllister v. Millville Mut. Ins. Co., 640 A.2d 1283, 1288 (Pa. Super.
Ct. 1994)); see also Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d
776, 782 (Mich. 2003) (AThis approach, where judges divine the parties= reasonable expectations and then rewrite the contract
accordingly, is contrary to the bedrock principle of American contract law that
parties are free to contract as they see fit, and the courts are to enforce the
agreement as written absent some highly unusual circumstance, such as a
contract in violation of law or public policy.@).





[10] Schaefer,
124 S.W.3d at 162 (citing Royal Indem. Co. v. Marshall, 388 S.W.2d 176,
181 (Tex. 1965) (ACourts cannot make new contracts between the parties,
but must enforce the contracts as written.@)).